# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICHOLAS RUBINO, | : | |
|     Plaintiff, | : | |
| | : | |
| vs. | : | Case No: 3:05cv1955 (PCD) |
| | : | |
| JOHN R. SADDLEMIRE, | : | |
|     Defendant. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Nicholas Rubino filed this action, pursuant to 42 U.S.C. §§ 1983 and 1988, against Defendant John R. Saddlemire, in his individual capacity and in his official capacity as the Vice-President for Student Affairs at the University of Connecticut. Both parties move for summary judgment. For the reasons discussed below, Defendant's Motion for Summary Judgment [Doc. No. 25] is **denied** and Plaintiff's Motion for Summary Judgment [Doc. No. 28] is **denied**.

## I. BACKGROUND

Plaintiff is and was, on April 6, 2004, a student at the University of Connecticut. Defendant is and was Vice-President of Student Affairs. On April 6, 2004, Plaintiff was arrested by University of Connecticut police. The parties dispute the circumstances leading to the arrest, which occurred at the Celeron Square Apartments after the NCAA championship basketball game. Defendant asserts that Plaintiff was arrested "for jumping on an overturned car, damaging it and inciting the crowd," (Def.'s Local Rule 56(a)(1) Statement ¶ 1), whereas Plaintiff contends that he was arrested "when he jumped down from an overturned vehicle," (Pl.'s Local Rule 56(a)(1) Statement ¶ 3).

On April 14 and May 6, 2004, the University of Connecticut sent letters to Plaintiff notifying him that he was being charged with violations of the University's *Student Code*. (May 6, 2004 Clokey Letter, Ex. A to Clokey Aff.[1])  On May 20, 2004, the University held a judicial disciplinary hearing regarding Plaintiff's conduct on the night of his arrest.  Plaintiff had the opportunity to present witnesses and cross-examine the University's witnesses at the hearing, however, he alleges that he was prevented from fully defending against the charges. (See Pl.'s Local Rule 56(a)(2) Statement ¶ 6.)

David Clokey, the Assistant Vice-President for Student Affairs, acted as the prosecutor during the hearing.  The University presented Officer Fensley, who observed Plaintiff's conduct and participated in his arrest, as a witness at the hearing, and submitted the police report of the incident as evidence.  Officer Fensley testified that he saw Plaintiff jump off the overturned vehicle.  The University also presented evidence going to show that Plaintiff had previously violated the *Student Code* in an unrelated incident and, as a result, was on probation at the time of the incident in question.  Plaintiff presented one witness, Mr. Uzo, to testify on his behalf. Mr. Uzo testified that Plaintiff climbed on the overturned vehicle in order to photograph the crowd.

On May 21, 2004, Karen Bresciano, the Assistant to the Dean of Students at the University of Connecticut and the hearing officer at Plaintiff's May 20, 2004 hearing, issued her decision suspending Plaintiff from the University of Connecticut for two years.  The decision specifically stated that the University would not accept credits earned at another institution

---

[1]   David Clokey has served as the Assistant Vice-President for Student Affairs at the University of Connecticut since August 2002.  In that capacity, he is responsible for prosecuting disciplinary actions against students for violations of the University's *Student Code*. (Clokey Aff. ¶ 2.)

during this period of suspension.  The decision provided that upon readmission to the University, Plaintiff would be placed on probation for two years, which "includes the probability of 'University Suspension' or 'University Expulsion' if the student is found responsible for a subsequent violation during the probationary period.'" Bresciano also required Plaintiff to write a letter of apology to the owner of the car and to provide proof that he had paid restitution, as determined by the courts, to the owner of the car. (<u>See</u> Decision Letter, Ex. A to Bresciano Aff.)

Under the University's *Student Code*, any student involved in a disciplinary hearing has the right to appeal a hearing officer's decision to Defendant.  In accordance with the *Student Code*, Plaintiff appealed Bresciano's decision to Defendant.  The *Student Code* provides that such appellate review shall include consideration of the record of the original hearing and supporting documents for a claim of error in the hearing procedure that substantially affected the decision; or consideration of new information that was not known to the accused student at the time of the hearing and that is sufficient to alter the decision of the hearing body.  On June 10, 2004, Defendant upheld the hearing officer's decision, concluding that the hearing process and resulting disciplinary action were in accordance with the University's judicial process and consistent with such violations of the *Student Code*.  Specifically, Defendant noted that:

> your letter does not provide any compelling information that warrants granting your appeal for a new hearing.  In particular, the undisputed information that you were on top of an overturned vehicle provides ample justification for the decision of the hearing officer.  The total disregard and damaging of a fellow student's property is simply unacceptable.

(Appeal Decision Letter, Ex. A to Saddlemire Aff.)

Plaintiff filed his Complaint in this Court on December 22, 2005.  After completing the two-year suspension, from April 14, 2004 through May 31, 2006, Plaintiff was readmitted to the University of Connecticut for the fall 2006 semester and has attended classes this year.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate. Anderson, 477 U.S. at 255.  When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential

Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." The nonmoving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. In making this determination, the court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted). A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

## III.   DISCUSSION

### A.   Request for Injunctive Relief

In his Complaint, Plaintiff asks this Court to enter a permanent injunction enjoining Defendant "from enforcing any disciplinary action imposed on the plaintiff as a result of any proceedings that occurred on May 20, 2004." (Compl.)  To the extent that Plaintiff seeks to require Defendant to readmit Plaintiff to the University, that issue is moot, as Plaintiff was readmitted in the fall of 2006 and took classes that semester. See Fox v. Board of Trustees of the State Univ. of New York, 42 F.3d 135, 140 (2d Cir. 1994) ("A case is moot, and accordingly the federal courts have no jurisdiction over the litigation when 'the parties lack a legally cognizable interest in the outcome'") (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631, 59 L. Ed. 2d 642, 99 S. Ct. 1379 (1979)).  Plaintiff requests, however, an injunction barring Defendant from "enforcing any disciplinary action imposed on Plaintiff."  To the extent that Plaintiff's Complaint seeks to compel Defendant to remove the suspension from Plaintiff's disciplinary record and lift the ban on the transfer of credits that Plaintiff earned at other educational institutions during his suspension, the issues are not moot.

## B.    Sovereign Immunity

The claim for monetary damages against Defendant in his official capacity is barred by the Eleventh Amendment.  With limited exceptions, or unless explicitly waived, Eleventh Amendment sovereign immunity bars suits for monetary damages against a state in federal court.[2] Hans v. Louisiana, 134 U.S. 1, 18, 10 S. Ct. 504, 33 L. Ed. 842 (1890); Edelman v. Jordan, 415 U.S. 651, 663, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).  Sovereign immunity protects officials sued in their "official capacity" because a suit against a state officer concerning

---

[2]      Connecticut state universities are entitled to claim immunity under the Eleventh Amendment. See Oliver v. Univ. of Conn. Health Care, 292 F. Supp. 2d 398, 405-06 (D. Conn. 2003); Brown v. W. Conn. State Univ., 204 F. Supp. 2d 355, 361 (D. Conn. 2002).

a matter in which the officer represents the state is, in effect, a suit against the state. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Congress did not abrogate state sovereign immunity through the enactment of 42 U.S.C. § 1983. Quern v. Jordan, 440 U.S. 332, 345, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979).

Plaintiff concedes that his claim for money damages against Defendant in his official capacity is barred by sovereign immunity, however, he correctly argues that injunctive relief is available against a state defendant sued in his official capacity. The Eleventh Amendment does not bar suits for prospective injunctive relief against state officials, as such falls within the Ex parte Young exception to sovereign immunity. See Quern, 440 U.S. at 337 (although private parties may not seek a "retroactive award which requires the payment of funds from the state treasury," a federal court may, under Ex parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), "enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury"); Will, 491 U.S. at 71 n.10 ("a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State") (citation omitted). Accordingly, Plaintiff may seek money damages from Defendant in his individual capacity and prospective injunctive relief from Defendant in his official capacity.

### C. Due Process

#### 1. Procedural Due Process

When the government affects the private interests of individuals, it may not proceed arbitrarily, but must provide individuals with due process. See Wasson v. Trowbridge, 382 F.2d 807, 811 (2d Cir. 1967); Cafeteria and Restaurant Workers, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 81 S. Ct. 1743, 1748, 6 L. Ed. 2d 1230 (1961). Defendant does not dispute that Plaintiff was entitled to due process when he was faced with the prospect of a two-year suspension from college as a result of the charges leveled against him by Defendant and David Clokey. Indeed, it seems well established that due process applies when a state-funded university imposes a two-year suspension upon a student. See Goss v. Lopez, 419 U.S. 565, 576 n.8, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975) ("Since the landmark decision of the Court of Appeals for the Fifth Circuit in Dixon v. Alabama State Board of Education, 294 F.2d 150, cert. denied, 368 U.S. 930 (1961), the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion.") (citing, among others, Hagopian v. Knowlton, 470 F.2d 201, 211 (2d Cir. 1972); De Jesus v. Penberthy, 344 F. Supp. 70, 74 (D. Conn. 1972)); Donohue v. Baker, 976 F. Supp. 136, 147 (N.D.N.Y. 1997) ("It is well settled that an expulsion from college is a stigmatizing event which implicates a student's protected liberty interest."). Once it is established that a constitutionally protected interest exists, the issue remains "what process is due." See Morrissey v. Brewer, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," and the Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." Mathews v. Eldridge, 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). It has

also been recognized, however, that due process is not a "technical conception with a fixed content unrelated to time, place and circumstances," but rather "is flexible and calls for such procedural protections as the particular situation demands." Id. at 334; see also Winnick v. Manning, 460 F.2d 545, 549 (2d Cir. 1972) ("Due process does not invariably require the procedural safeguards accorded in a criminal proceeding. Rather, the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."). Under the balancing test for procedural due process articulated in Mathews, the Court must balance three factors to determine whether due process has been satisfied: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335; see also Wasson v. Trowbridge, 382 F.2d 807, 811-12 (2d Cir. 1967) ("to determine in any given case what procedures due process requires, the court must carefully determine and balance the nature of the private interest affected and of the government interest involved, taking account of history and the precise circumstances surrounding the case at hand").

In the landmark decision recognizing the due process rights of students at state universities, Dixon v. Alabama State Board of Education, 294 F.2d 150, 158-59 (5th Cir. 1961), the Fifth Circuit established the basic due process requirements of notice and a hearing in

disciplinary proceedings prior to the imposition of a severe sanction, such as an expulsion.[3]

Subsequently, in <u>Goss v. Lopez</u>, the Supreme Court held that students facing a ten-day

suspension must be given some kind of notice and afforded some type of hearing. 419 U.S. at

579.  The Court stated that the hearing could be held immediately following the incident and be

informal.  Specifically, the Court held that the student was entitled to "be given oral or written

notice of the charges against him and, if he denies them, an explanation of the evidence the

authorities have and an opportunity to present his side of the story." <u>Id</u>. at 581.  Although the

Supreme Court did not require formal hearings, the opportunity to be represented by counsel, a

right of confrontation or cross-examination of witnesses or an opportunity to call witnesses, <u>see</u>

<u>id</u>. at 585, the Court did caution that "suspensions or expulsions for the remainder of the school

term, or permanently, may require more formal procedures." <u>Id</u>. at 584.

*a.     Notice*

Plaintiff first argues that the notice provided by the University was deficient.  On April

14, 2004, Plaintiff received a letter from David Clokey, which "serve[d] as formal notification

regarding the serious nature of the information [the University had] received from the University

Police." (Apr. 14, 2004 Clokey Letter, Pl.'s Ex. B1.)  The letter notified Plaintiff of the charges

against him and informed Plaintiff that he was "under an interim suspension from the University,

effective immediately." (<u>Id</u>.)  The letter went on to say that an investigation was underway, and

that an on-campus judicial hearing would be forthcoming. (<u>Id</u>.)  On May 6, 2004, Plaintiff

received a second letter informing him that a judicial hearing was scheduled for May 20, 2004.

---

[3]     Although this case did not involve an expulsion, a two-year suspension during which the
University would not accept credits earned at another institution certainly constitutes a "severe
sanction."

(May 6, 2004 Clokey Letter, Pl.'s Ex. B2.)  The May 6 letter reiterated the charges against

Plaintiff and gave him information about the upcoming hearing.  Specifically, the letter informed

Plaintiff that he had a right to have a "support person" present during the hearing, would be

permitted to bring witnesses to present information on his behalf, was entitled to submit a

written statement for the judicial board to consider and could have other people submit written

statements on his behalf. (Id.)  The letter also indicated that Clokey was contacting "University

Police" to provide information at the hearing. (Id.)  The letter informed Plaintiff where he could

find information regarding hearing procedures and attached a copy of the police incident report.

(Id.)

Both the April 14 and the May 6 letters informed Plaintiff that the alleged violation

occurred on April 6, 2004, and notified Plaintiff that he was being charged with the following

violations of the University's *Student Code*:

Code Violations (Section II Part B):

2.  Participating in or inciting others to participate in the violent disruption or obstruction of any University action including but not limited to teaching, research, and administration.

3.  The threat of or actual physical assault or abuse, including sexual assault and unwelcome sexual contact; hazing; stalking; verbal abuse, intimidation, and coercion, and disrespectful behavior; or other conduct that threatens or endangers the health or safety of any person.

4.  Attempted or actual theft or property or services, unauthorized possession, duplication, or misuse of or damage to University property or other personal or public property, including but not limited to records, electronic files, telecommunications systems, forms of identification, and keys.

(Apr. 14, 2004 Clokey Letter; May 6, 2004 Clokey Letter.) The police incident report, attached

to the May 20 letter, elaborates, also setting forth the charges against Plaintiff, as well as

providing a summary of the conduct at issue:

> While monitoring a crowd of approx. 2000 people at Celeron Square Apartments,
> Officers observed [Plaintiff] jumping on a flipped over vehicle, damaging it and
> inciting others to damage the vehicle. Additional information from University
> Police: On 4-6-04 at approximately 2:56am officers monitoring a large crowd of
> several thousand at Celeron Square saw an overturned black Honda with several
> people on top of it jumping up and down rocking it back and forth while
> screaming and yelling at a large crowd that had ringed the vehicle. The vehicle
> was severely damaged. Officers were able to detain and arrest six of the people
> on top of the vehicle while the other ran away. While doing this officers were
> being pelted with rocks, bottles and cans from the surrounding crowd. All six,
> including [Plaintiff], were placed under arrest for Riot 1st, Breach of Peace,
> Criminal Mischief 1st, Reckless Endangerment.

(Incident Report, Ex. B to Clokey Aff.) In the hearing officer's letter to Plaintiff following the

hearing, she informed him that he was found "responsible" on all charges. (See Decision Letter,

Ex. A to Bresciano Aff.)

Plaintiff argues that the notice did not sufficiently apprise him of the charges against him,

claiming that "the University simply supplied a laundry list of widely varied actions taken from

the student code without specifying which violation, if indeed any, applied to the plaintiff."

(Pl.'s Mem. Supp. Mot. Summ. J. 10.) Plaintiff asserts that the insufficient notice deprived him

of the opportunity to prepare a meaningful defense and contends that "[t]he University, at a

minimum, had an obligation to inform the plaintiff of the specific charges against him and how

the evidence related to that charge." (Id. at 10-11.)

With regard to notice, the Goss Court held that a student is entitled to "be given oral or

written notice of the charges against him," and elaborated that:

> There need be no delay between the time "notice" is given and the time of the
> hearing. In the great majority of cases the disciplinarian may informally discuss

the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

Id. at 581-82. The "timing and content" of the requisite notice "will depend on appropriate accommodation of the competing interests involved." Id. at 579. The Second Circuit has said that "[n]otice must be 'reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 94 L. Ed. 865, 70 S. Ct. 652 (1950)), cert. denied, 496 U.S. 941, 110 S. Ct. 3225, 110 L. Ed. 2d 671 (1990).

"While 'no court since Dixon has denied that the student must be given prior notice of the grounds on which the charge is based,' it is also true that a notice 'need not be drawn with the precision of a criminal indictment.'" Blanton v. State University of New York, 489 F.2d 377, 386 (2d Cir. 1973) (quoting C. Wright, The Constitution on the Campus, 22 VAND. L. REV. 1027, 1072 (1969)). The Second Circuit echoed this sentiment again in Rosa R., holding that "[t]he notice requirement of due process does not require that school administrators provide a detailed listing of all possible courses of action for which discipline might be imposed or of all possible penalties." 889 F.2d at 439 (citing Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 686, 92 L. Ed. 2d 549, 106 S. Ct. 3159 (1986)).

In view of these authorities, it cannot be said here that the notice sent to Plaintiff deprived him of due process. The two letters informed Plaintiff of the code sections he was accused of violating, gave him notice of the hearing date, informed him that he had a right to have a "support person" present during the hearing, would be permitted to bring witnesses to

present information on his behalf, was entitled to submit a written statement for the judicial

board to consider and could have other people submit written statements on his behalf, and

notified him that the University would be contacting University Police to appear and provide

information at the hearing. The May 6, 2004 letter also informed Plaintiff where he could find

information regarding hearing procedures and attached a copy of the police incident report.

Even if the code violations were ambiguous, the police incident report made clear what conduct

was at issue. Furthermore, there is no evidence that Plaintiff objected to the notice prior to or

during the hearing, requested clarification, was under any misunderstanding regarding the nature

of the charges against him or was otherwise prejudiced in preparing his defense. Finally, the

letters, coming thirty-six and fourteen days, respectively, prior to the hearing, gave Plaintiff

sufficient time to prepare for the hearing. In view of the evidence presented, it appears that the

notice was "reasonably calculated, under all the circumstances, to appraise [Plaintiff] of the

pendency of the action and afford [him] an opportunity to present [his] objections." Mullane,

339 U.S. at 313. The due process clause does not require anything more.

> b.     *Evidence*

Plaintiff next argues that the University suspended him without sufficient evidence to

support the decision. He argues that procedural due process requires at least "some evidence to

support the government's interference with a constitutional right" and a "meaningful hearing"

prior to the deprivation of a property or liberty interest. (Pl.'s Mem. Supp. Mot. Summ. J. 11-

12.)

Plaintiff is correct that the University's power to suspend him "is not unlimited and

cannot be arbitrarily exercised." Dixon, 294 F.2d at 157. Without a "reasonable and

constitutional ground" for suspending Plaintiff, this Court "would have a duty to require

reinstatement." Id. Moreover, "[t]he possibility of arbitrary action is not excluded by the existence of reasonable regulations," as "[t]here may be arbitrary application of the rule to the facts of a particular case." Id. Following Dixon, the Eleventh Circuit required that the decision to suspend students on the basis of academic dishonesty be supported by "substantial evidence." Nash v. Auburn University, 812 F.2d 655, 668 (11th Cir. 1987).[4] Similarly, the Ninth Circuit has held, in the case of college students who were reprimanded, put on probation and expelled for attending a rally, that any disciplinary action must be supported by "substantial evidence" in order to satisfy due process requirements. Jackson v. Hayakawa, 761 F.2d 525, 527 (9th Cir. 1985). Although the Second Circuit has not specifically addressed the issue of the sufficiency of the evidence in school disciplinary proceedings, the Court assumes, based on the foregoing authority as well as the Supreme Court's requirement that the hearing be a "meaningful" one, see Mathews v. Eldridge, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976); Parratt v. Taylor, 451 U.S. 527, 540, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), that the University's disciplinary action must be supported by substantial evidence[5] in order to comport with due process.[6]

---

[4]    The Supreme Court has recognized that "there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter." Board of Curators of University of Missouri v. Horowitz, 435 U.S. 78, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978). Although the students in Nash were suspended for academic dishonesty, or cheating, their suspension was analyzed under the standard for disciplinary, rather than academic proceedings, and therefore, the reasoning is applicable to this case.

[5]    Substantial evidence is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (internal quotation and citation omitted); Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).

[6]    Plaintiff also argues that the University failed to follow its policy that disciplinary decisions "shall be made on the basis of whether or not the information presented at the hearing proves in a clear and convincing manner that the accused student violated The Student Code," (University of Connecticut Student Code, Part IV, § D(2)(k), Pl.'s Ex. A), and thereby violated his due process right. (See Pl.'s Mem. Supp. Mot. Summ. J. 16.) The Second Circuit has stated, however, that it is "not inclined to hold that every deviation from a university's regulations constitutes a deprivation

As discussed above, the following evidence was presented at trial: The University presented Officer Fensley, who observed Plaintiff's conduct and participated in his arrest, as a witness at the hearing, and submitted the police report of the incident[7] as evidence. Officer Fensley testified that he saw Plaintiff jump off the overturned vehicle. The University also presented evidence going to show that Plaintiff had previously violated the *Student Code* in an unrelated incident and, as a result, was on probation at the time of the incident in question. Plaintiff presented one witness, Mr. Uzo, to testify on his behalf. Mr. Uzo testified that Plaintiff climbed on the overturned vehicle in order to photograph the crowd. He testified that the vehicle had been "flipped" over for "twenty minutes or so" before Plaintiff climbed on top, and that while Plaintiff was on the vehicle, Mr. Uzo did not see Plaintiff yelling, jumping, or spurring on the crowd. Finally, Mr. Uzo testified that Plaintiff was arrested immediately after he jumped off the vehicle.

---

of due process." Winnick v. Manning, 460 F.2d 545, 550 (2d Cir. 1972); see also Turof v. Kibbee, 527 F. Supp. 880, 884 (S.D.N.Y. 1981). Because the standard, for due process purposes, is whether the decision is supported by substantial evidence, the fact that the University may not have found the decision to be supported by clear and convincing evidence is not a procedural deviation which would "rise to constitutional proportions." Winnick, 460 F.2d at 550. This alleged deviation—if proved—would in itself not lead to a denial of due process. Id.

[7]     As discussed above, the police report of the incident set forth the following facts: "While monitoring a crowd of approx. 2000 people at Celeron Square Apartments, Officers observed [Plaintiff] jumping on a flipped over vehicle, damaging it and inciting others to damage the vehicle. Additional information from University Police: On 4-6-04 at approximately 2:56am officers monitoring a large crowd of several thousand at Celeron Square saw an overturned black Honda with several people on top of it jumping up and down rocking it back and forth while screaming and yelling at a large crowd that had ringed the vehicle. The vehicle was severely damaged. Officers were able to detain and arrest six of the people on top of the vehicle while the other ran away. While doing this officers were being pelted with rocks, bottles and cans from the surrounding crowd. All six, including [Plaintiff], were placed under arrest for Riot 1st, Breach of Peace, Criminal Mischief 1st, Reckless Endangerment." (Incident Report, Ex. B to Clokey Aff.)

One day after the hearing, the hearing officer, Ms. Bresciano, issued her decision

suspending Plaintiff.  In her May 21, 2004 decision letter, she based her decision on the

following facts:

> During this hearing, information was presented that [Plaintiff] w[as] one of
> several people up on top of an overturned car at Celeron after the NCAA
> championship. [Plaintiff] w[as] taking pictures of the crowd.  When [Plaintiff]
> jumped off the car [he] w[as] arrested by University Police.

(Decision Letter, Ex. A to Bresciano Aff.)  Based on this evidence, Bresciano found Plaintiff

responsible for, *inter alia*, "[p]articipating in or inciting others to participate in the violent

disruption or obstruction of any University action," "[t]he threat of actual physical assault or

abuse, . . . disrespectful behavior; or any other conduct that threatens or endangers the health or

safety of any person," and "unauthorized possession . . . or misuse of or damage to University

property or other personal or public property." (Id. (citing *Student Code*, Part II, §§ B-2, B-3 &

B-5).)

As the Second Circuit has made clear, "the nature of the sanction affects the validity of

the procedure used in imposing it." Farrell v. Joel, 437 F.2d 160, 162 (2d Cir. 1971).  The

sanction imposed here was a severe one, therefore requiring more procedural protections that a

short suspension.  The findings that Bresciano made are not disputed, however, there is a

question of fact whether those findings are sufficient to find Plaintiff responsible for the

violations of the University's *Student Code* outlined above.  On the facts presented, one might

find that Plaintiff was joining in the disruptive behavior, but there is little evidence that he was

"inciting others to participate in the violent disruption or obstruction of any University action,"

threatening "actual physical assault or abuse," or engaging in "conduct that threatens or

endangers the health or safety of any person."  On these facts, the Court cannot find, as a matter

of law, that there was or was not substantial evidence to support the charges, other than the findings that Plaintiff joined in the disruptive behavior to some extent and potentially caused some damage by climbing on the overturned vehicle. It is a question of fact for the jury to determine whether there was substantial evidence to find Plaintiff responsible on the charges of violations of the University's *Student Code*. Accordingly, neither party is entitled to summary judgment on Plaintiff's procedural due process claim.

2. Substantive Due Process

Substantive due process imposes limits on arbitrary state action regardless of what procedural protection is provided. Substantive due process protects against "'egregious conduct' which goes beyond merely 'offending some fastidious squeamishness or private sentimentalism' and can fairly be viewed as so 'brutal' and 'offensive to human dignity' as to shock the conscience." Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973), partially abrogated on other grounds by Graham v. Connor, 490 U.S. 386, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)); see also Rochin v. California, 342 U.S. 165, 172, 174, 96 L. Ed. 183, 72 S. Ct. 205 (1952) (articulating the "shocks the conscience" test for substantive due process violations); County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (holding that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'") (citation omitted). The Second Circuit has said that substantive due process "does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit . . . . [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001) (quoting Natale v. Town of

Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)). The standard is a demanding one; substantive due process operates as "an outer limit on the legitimacy of governmental action." Natale, 170 F.3d at 263.[8]

Plaintiff argues that the conduct at issue here "shocks the conscience," alleging that Defendant imposed the two-year suspension without any evidence to support the action and only for the purpose of setting an example to other students and to curb future celebrations after sporting events. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 14-17.)[9]  The undisputed evidence presented here is simply that Plaintiff was found to have climbed on an overturned vehicle, took pictures of the crowd, jumped off, and was arrested.  On these facts, Defendant imposed a two-year suspension from the University.  To the extent a finding of improper conduct, as noted above, was supported by the evidence and in view of Plaintiff's probationary status at the time, a penalty of some significance would be sustainable.  Whether the punishment imposed is so out of proportion to the conduct proved as to "shock the conscience" or be ""so outrageously arbitrary as to constitute a gross abuse of governmental authority" is a question of fact.  The Court cannot find as a matter of law that the punishment did or did not violate Plaintiff's substantive due process right.  Accordingly, neither party is entitled to summary judgment on Plaintiff's substantive due process claim.

### D.    Qualified Immunity

---

[8]    The Supreme Court, in County of Sacramento, stated that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm," emphasizing that "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" 523 U.S. at 848 (quoting Paul v. Davis, 424 U.S. 693, 701, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976)).

[9]    Specifically, Plaintiff claims that Defendant imposed the two-year suspension in his case because he was arrested and solely to make an example out of him due to the negative publicity surrounding the post-NCAA championship celebrations. (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. 14.)

A government employee is entitled to qualified immunity from civil liability under §
1983 if the conduct attributed to him "does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald,
457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), or if it was objectively reasonable
for him to believe that his conduct did not violate those rights, see Anderson v. Creighton, 483
U.S. 635, 638-39, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987); X-Men Sec., Inc. v. Pataki, 196 F.3d
56, 65-66 (2d Cir. 1999). "To be deprived of the defense of qualified immunity, a public official
must not simply violate plaintiff's rights; rather, the violation of plaintiff's rights must be so
clear that no reasonable public official could have believed that his actions did not violate such
rights." Stanley v. Cooper, 996 F. Supp. 316, 320-21 (S.D.N.Y. 1998); see also Birmingham v.
Ogden, 70 F. Supp. 2d 353, 375 (S.D.N.Y. 1999) ("where the law is clearly settled, summary
judgment may be granted on qualified immunity grounds if the only conclusion a rational jury
could reach is that reasonable officials would disagree about the legality of the defendants
conduct under the circumstances") (citation omitted). In sum, qualified immunity shields a
public official performing discretionary acts from civil liability if the law was not clearly
established at the time of the performance of his or her conduct; or, in the case of clearly
established law, if it was objectively reasonable for the public official to believe that his or her
acts were lawful in light of the clearly established law. Anderson, 483 U.S. at 638-39; Harlow,
457 U.S. at 818.

Defendant argues that his conduct did not violate any clearly established rights of which
a reasonable person would have known. (Def.'s Mem. Supp. Mot. Summ. J. 18.) In order for a
constitutional right to be "clearly established,"

its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell v. Forsyth, 472 U.S. 511, 535 n.12, 86 L. Ed. 2d 411, 105 S. Ct. 2806; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987).

Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). The standard for determining whether a constitutional right was "clearly established" in the qualified immunity context is the same as the standard in a criminal case for determining whether a defendant had "fair warning" that his conduct was unlawful. Id. at 739-40 & n.10; see also United States v. Lanier, 520 U.S. 259, 270-71, 137 L. Ed. 2d 432, 117 S. Ct. 1219 (1997).[10] The Supreme Court has explained further that:

> In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful."

Anderson, 483 U.S. at 640 (citation omitted). Following Hope and Lanier, it is clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741. Therefore, the question here is whether the state of the

---

[10]    In Lanier, the Supreme Court stated: "The object of the 'clearly established' immunity standard is not different from that of 'fair warning' as it relates to law 'made specific' for the purpose of validly applying [18 U.S.C. § 242, which makes it a crime for a state official to act 'willfully' and under color of law to deprive a person of rights protected by the Constitution]. The fact that one has a civil and the other a criminal law role is of no significance; both serve the same objective, and in effect the qualified immunity test is simply the adaptation of the fair warning standard to give officials (and, ultimately, governments) the same protection from civil liability and its consequences that individuals have traditionally possessed in the face of vague criminal statutes. To require something clearer than 'clearly established' would, then, call for something beyond 'fair warning.'" 520 U.S. at 270-71.

law in 2004 gave Defendant "fair warning" that his alleged conduct toward Plaintiff was unconstitutional.

It is clearly established, and was so at the time Plaintiff was suspended, that University officials must comply with procedural and substantive due process requirements before disciplining a student. Dixon v. Alabama State Board of Education, the landmark case establishing students' procedural and substantive due process rights, was decided in 1961. Since Dixon, courts have routinely required notice and a meaningful hearing prior to disciplining students, and require that any decisions be supported by substantial evidence. See, e.g., Goss v. Lopez, 419 U.S. 565, 573, 42 L. Ed. 2d 725, 95 S. Ct. 729 (1975); Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989); Nash v. Auburn University, 812 F.2d 655, 668 (11th Cir. 1987); Jackson v. Hayakawa, 761 F.2d 525, 527 (9th Cir. 1985). Moreover, Rochin's "shocks the conscience" test was established by the Supreme Court in 1951, and since that time, courts have routinely held that government officials violate substantive due process rights when they engage in conduct which is arbitrary or shocks the conscience. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998); Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002); Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001). It is a question of fact whether it was objectively reasonable for Defendant to believe that his conduct was lawful, however, it is clear, as a matter of law, that the rights in question were clearly established and that Defendant had fair warning thereof.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. No. 25] is **denied** and Plaintiff's Motion for Summary Judgment [Doc. No. 28] is **denied**.

SO ORDERED.

Dated at New Haven, Connecticut, March  1 , 2007.


_____/s/_____
Peter C. Dorsey, U.S. District Judge
United States District Court